UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

ALLEN JEFFREY SATZ

Plaintiff

V.

KESHET STARR
CORY GLICKSMAN
YONATAN KLAYMAN
JENNIFER LANKIN
THE ORGANIZATION FOR THE RESOLUTION FOR AGUNOT
MORDECHAI WILLIG
SCOTT HOBERMAN
SHLOMO WEISSMANN, ESQ.
BETH DIN OF AMERICA
AVRAHAM KAHAN
DOVID BARTFELD
YISROEL ISAACS
VAAD HADIN V'HORAAH

Defendants

**Civil Action**
**Complaint**
**Jury Demand**

Plaintiff Allen J. Satz (the "Plaintiff"), on behalf of himself (*pro se*) for his complaint against the defendants with jury demand stated within, hereby alleges:

## JURISDICTION AND VENUE

1. This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the parties are citizens of different States and the amount in controversy exceeds $75,000, exclusive of interest and costs.

2. Venue is proper in the District of New Jersey because the events giving rise to this action occurred in New Jersey.

## PARTIES

3. Plaintiff. Allen Jeffrey Satz resides in Bergen County, New Jersey at 113 Cameron Road, Bergenfield NJ 07621. Plaintiff has been a resident and private citizen of the State of New Jersey at all times throughout this complaint.

4. Defendant Keshet Starr is a resident of the State of New Jersey. Her address is 261 Exeter Way, Hillside NJ, 07205.

5. Defendant Cory Glicksman is a resident of the State of New Jersey. His address is 675 John Street, Teaneck NJ, 07666.

6. Defendant Yonatan Klayman is a resident of the State of New Jersey. His address is 576 Standish Road, Teaneck NJ, 07666.

7. Defendant Jennifer Lankin works in the State of New York. Her address is 551 West 181St, Unit 123, New York NY, 10033

8. Defendant The Organization for the Resolution for Agunot is located in New York. Their address is 551 West 181st Street, #123, New York NY, 10033.

9. Defendant Mordechai Willig works for The Beth Din of America which is located in the State of New York. Their address is 305 Seventh Ave, 12th Floor, New York NY, 10001-6008.

10. Defendant Scott Hoberman works for The Beth Din of America which is located in the State of New York. Their address is 305 Seventh Ave, 12th Floor, New York NY, 10001-6008.

11. Defendant Shlomo Weissmann works for The Beth Din of America which is located in the State of New York. Their address is 305 Seventh Ave, 12th Floor, New York NY, 10001-6008.

12. Defendant The Beth Din of America is located in the State of New York. Their address is 305 Seventh Ave, 12th Floor, New York NY, 10001-6008.

13. Defendant Avraham Kahan is a resident of the State of New York. His address is 45 Tranquility Road, Suffern NY, 10901.

14. Defendant Dovid Bartfeld is a resident of the State of New York. His address is 8 Hillside Dr., Thiells NY, 10984.

15. Defendant Yisroel Isaacs is a resident of the State of New York. His address is 21 South Ridge Rd., Pomona NY, 10970.

**Preliminary Statement**

16. In October of 2020, the Plaintiff and his ex-wife finalized their divorce in the state of New Jersey. Within their Matrimonial Settlement Agreement (MSA), they agreed to go to a Jewish Court known as a Beis Din to adjudicate the matter of the "Gett", the Jewish divorce document. The Plaintiff and Mrs. Satz met with the Beis Din in November of 2021. The Beis Din consisted of Mr. Avraham Kahan, Mr. Dovid Bartfeld, and Mr. Yisroel Isaacs. In December of 2021, the Beis Din ruled that they cannot make a decision on the "Gett" because, according to Jewish Law, the Plaintiff did not "participate" in the Beis Din process since he did not speak. Judge Magali Francois ordered the Plaintiff to go back to the Beis Din and "participate".

17. On or about July 6, 2022, Mrs. Satz, without the Plaintiff, supposedly had another arbitration hearing with the Beis Din on whether the Plaintiff was obligated to give Mrs. Satz the 'Gett'. The ruling, unfortunately, contained the following lies:

1. The ruling says that Mrs. Satz "summoned him to arbitration [Din] before numerous Rabbinical Courts". That is not true. The Plaintiff was only summoned to the same Rabbinical court twice, the Beis Din of America (BDA).
2. The ruling says "he has been deemed like he is refusing to appear in Din [before them]". Again, not true. Both times the Plaintiff agreed to go before them.

3. The ruling continues and says that a "writ of recalcitrance has been issued against him". Another lie. There never was a writ of recalcitrance issued against the Plaintiff.

4. Finally, the ruling says "he's been summoned by other Batei Din [as well] and he has not responded to them properly". Again, another lie. Both times the Plaintiff responded properly.

18. The ruling then goes on to state how everyone should publicly shame the Plaintiff to give the 'Gett'.

19. However, in #10 it says that the public shaming can happen "until Ari [Allen] Satz submits to the jurisdiction of Bais Din or divorces her according to the Law of Moses & Israel, at which time, if he has any monetary claims [against her], or she and the children [have] against him, they will be obliged to adjudicate [the issues] before a Bais Din [Jewish Court] that judges and rules according to Halachah [Jewish Law]".

20. In September of 2022, the plaintiff, regardless of the lies of the ruling, agreed to submit to the jurisdiction of Beis Din, have them adjudicate the damages, and give the "Gett". However, Mr. Neal Turk speaking on behalf of Mrs. Satz asked if the 'Gett' will be given before the Jewish court hearing. Mr. Turk was told that the 'Gett' will be given after the Jewish court rules and any damages they award are paid. Mr. Turk considered this 'extortion' and declined the offer on Mrs. Satz's behalf.

23. In December of 2022, the plaintiff was contacted by Mr. Cory Glicksman from the Organization for the Resolution of Agunot (ORA). Mrs. Satz had contacted them regarding the ruling in an effort to compel the plaintiff to give the 'Gett' or face public shaming. Mr. Glicksman, along with Keshet Starr, the Director of ORA at the time, were made aware through numerous contacts that the ruling was filled with lies and how the Plaintiff agreed to go to Beis Din [Jewish

Court]. Their answer: If the 'Gett' wasn't given, the plaintiff will be publicly shamed throughout social media. In January of 2023, they posted the plaintiff's picture saying that he is "recalcitrant to submit to a Beis Din (Jewish Court)" and that people should not do business with him, engage him in conversation, or provide him with food or drink along with a copy of the ruling. In February of 2023, the picture was changed to a picture taken off a Zoom session where the Plaintiff was in the privacy of his own home. The picture was taken without knowledge and without consent. This picture was then used in flyers, at protests, and spread all over the internet.

24. In January of 2025, Keshet Starr resigned from her position at ORA. Yonatan Klayman and Jennifer Lankin took over her duties. They were both informed that the ruling contained lies yet did not remove it from the internet.

25. On July 24, 2024, the Plaintiff was summoned by the Beis Din of America to appear before them, or an alternative Beis Din, to arrange the "Gett". Even though the Plaintiff had no obligation to answer since (1) Mrs. Satz and the Plaintiff already had an agreement in place from their Matrimonial Settlement Agreement (MSA) regarding which Beis Din they agreed to go to regarding the "Gett", (2) the Plaintiff already fulfilled the Beis Din ruling by agreeing to go to Beis Din, have them adjudicate the case, award damages, and give the "Gett", but Mr. Turk refused on behalf of Mrs. Satz, and (3) beyond the MSA agreement, it was against the Plaintiff's religious beliefs to go to Beis Din after secular court. However, acting in good faith, the Plaintiff responded that he would go to the CRC Rabbinical Court. Mrs. Satz and the Plaintiff went a few times to try and come to an agreement. However, on the last time they met, they told Mrs. Satz she would have to pay damages and she never returned.

26. On March 10th, 2025, the Plaintiff received a 'second' summons from the Beis Din of America regarding the "Gett". This was against the Beis Din of America's own rules and

procedures which states that if a litigant chooses another Beis Din "the Beth Din will withdraw from the matter". However, the Plaintiff again agreed to go to the Beis Din of Beis HaVaad in Lakewood. Mrs. Satz and the Plaintiff went for one day and then world renown Rabbi's proclaimed that the Beis Din was not Kosher for "Gett"s.

27. On July 18th, 2025, the Plaintiff received a third summons from the Beis Din of America. In this summons, they claimed that the last Beis Din "informed us that you have not satisfactorily responded to their attempts to move the matter forward". That is not possible since we were only there for a day before the proclamation came out. They then threaten the Plaintiff and said "If you do not respond, you may be subject to a sh'tar seruv (contempt order of the Beth Din) and its consequences". Once again, the Plaintiff gave them a name of a Beis Din that he would appear before. The Beis Din of America said that this Beis Din was not approved by them. The Plaintiff informed the Beis Din of America that he and Mrs. Satz already have a ruling in place which says that he must submit to a Beis Din which he already did multiple times. It does not say that he needs to have the Beis Din approved by the Beis Din of America and he is interfering with our agreement. Also, the Plaintiff has no allegiance to the Beis Din of America and has never signed any agreement with them that they should have control over this situation.

28. Also, Mr. Mordechai Willig, the head of the Beis Din of America was placed in excommunication. This forbids anyone following anything that Mr. Willig says.

29. On August 15th, 2025, the Beis Din of America issued the Plaintiff an excommunication document stating that he "failed to appear in front of the Beth Din of America or an alternative beth din recognized by the Beth Din of America, for the purpose of giving a Get or submitting to beth din adjudication of Chavi Satz's request for a Get". An outright lie! This letter has been posted on the ORA web site.

30. The CRC Rabbinical Court and the Beis HaVaad refused to write public letters stating that the Plaintiff appeared in their court thereby allowing the Beis Din of Americas lies to go unchecked.

31. The arbitration ruling from July 6, 2022 was presided over by Mr. Avraham Kahan, Mr. Dovid Bartfeld, and Mr. Yisroel Isaacs from the Vaad Hadin V'Horaah. In the Beis Din's rules and procedures, it states that "The Vaad shall engage a stenographer to transcribe all Din Torah sessions. Additionally, the session shall be recorded as well". It goes on to say that "Copies of the transcript shall be made available to the parties on demand". The Plaintiff was not at the arbitration hearing and the ruling is riddled with lies. The plaintiff has requested a copy of the transcript of the hearing numerous times and has never had his request answered.

**Statement of Facts**

32. The Plaintiff was only summoned to one Beis Din.

33. The Plaintiff responded to each summon he received and never refused to appear.

34. The Plaintiff agreed to follow the Beis Din ruling from July 6, 2022 even though it was riddled with lies, he agreed to submit to Beis Din for adjudication.

35. Keshet Starr and Cory Glicksman from the Organization for the Resolution for Agunot (ORA) were made aware that the ruling was filled with lies and that the Plaintiff agreed to go to Beis Din.

36. The picture currently being used by ORA on their web site was taken over a zoom session by Mrs. Satz during a Parent Teachers Conference without the knowledge or consent of the Plaintiff. The Plaintiff was in the privacy of his own home where there is no access to the public view and the Plaintiff expects a reasonable expectation of privacy.

37. When Keshet Starr left as CEO of ORA, her replacements, Yonatan Klayman and Jennifer Lankin, were made aware of the lies and that the picture was an invasion of privacy.

38. The Plaintiff appeared before the CRC Rabbinical Court the first time he was summoned by the Beis Din of America even though he had no obligation to do so. The Beis Din of America was copied on all scheduling e-mails with the CRC Rabbinical Court.

39. The Plaintiff appeared before the Bais HaVaad Beis Din the second time he received a summons from the Beis Din of America. The Beis Din of America was copied on all scheduling e-mails with the Bais HaVaad Beis Din.

40. The Plaintiff has never signed any agreement with the Beis Din of America to be forced to follow their rules and procedures.

41. The Plaintiff has requested a copy of the transcript and the recording from the Vaad Hadin V'Horaah. No answer has ever been returned.

## CLAIMS FOR RELIEF

### Count One: Invasion of Privacy – Intrusion on Seclusion

New Jersey Rule 3.14, Part 2: Intrusion on Seclusion
Against Keshet Starr, Cory Glicksman, Yonatan Klayman, Jennifer Lankin, The Organization for the Resolution for Agunot (ORA)

42. Plaintiff repeats and realleges paragraphs 1 through 41, as if fully set forth herein.

43. New Jersey Rule 3.14, Part 2: Intrusion on Seclusion, a person is guilty of invasion of privacy when the "defendant has invaded (her/his) privacy by unreasonably intruding upon the plaintiff's seclusion".

44. The defendants, Mrs. Starr as the Director of ORA, Cory Glicksman, Yonatan Klayman, and Jennifer Lankin, intentionally used the picture taken in the privacy of the Plaintiff's own home. They used this picture on the ORA web site, Facebook page, on flyers, at protests, and other places.

45. Plaintiff possessed a reasonable expectation of privacy and seclusion concerning his home which does not have a view from the public domain.

46. Plaintiff did not consent to Defendant's obtaining, using, publishing, displaying, distributing, or disseminating the photograph on the Internet, flyers, banners, etc.

47. Without Plaintiff's permission, Defendant intentionally used and published the photograph on the Internet, including on www.getora.org, www.facebook.com, and www.instagram.com.

48. The photograph depicted the Plaintiff in an unflattering expression, which occurred within Plaintiff's private residence.

49. Defendant knew, or reasonably should have known, that Plaintiff had a reasonable expectation of privacy concerning the photograph and the circumstances depicted therein.

50. Defendant's publication of the photograph exposed Plaintiff's private life and private surroundings to persons who otherwise would not have had access to them.

51. Defendant's conduct was intentional, knowing, reckless, and undertaken with conscious disregard for Plaintiff's privacy rights.

52. As a direct and proximate result of Defendant's conduct, Plaintiff suffered damages, including but not limited to loss of privacy, humiliation, embarrassment, emotional distress, mental anguish, reputational harm, and other damages to be established at trial.

53. Plaintiff has also suffered and continues to suffer harm from the unauthorized Internet publication and dissemination of the photograph.

54. Plaintiff is informed and believes that the photograph may have been viewed, copied, shared, downloaded, reposted, or otherwise disseminated by additional persons over the Internet.

55. Plaintiff reserves the right to amend this Complaint as additional facts concerning the creation, publication, viewing, sharing, and dissemination of the photograph become known.

56 Defendant's conduct constitutes an invasion of Plaintiff's privacy by unreasonable intrusion upon seclusion under New Jersey common law.

57. Plaintiff seeks all damages and other relief permitted by law, including compensatory damages, damages for the invasion of Plaintiff's privacy interest, emotional-distress damages where legally recoverable, nominal damages, punitive damages where legally available, costs of suit, and such other relief as the Court deems just and equitable.

**Count Two: Invasion of Privacy: False Light**

New Jersey Rule 3.14, Part 1: False Light Invasion of Privacy

Against Keshet Starr, Cory Glicksman, Yonatan Klayman, Jennifer Lankin, The Organization for the Resolution of Agunot (ORA), Mordechai Willig, Scott Hoberman, Shlomo Weissmann, Beth Din of America (BDA)

58. Plaintiff repeats and realleges paragraphs 1 through 57, as if fully set forth herein.

59. New Jersey Rule 3.14, Part 1: False Light Invasion of Privacy, the rule states that "the defendant publicized material about (her/him) that is false and is such a major misrepresentation of (her/his) character, history, activities or beliefs that a reasonable person in the plaintiff's position would either be expected to take serious offense or be justified in feeling offended or aggrieved".

60. Defendants Starr, Glicksman, Klayman, and Lankin were contacted many times and told the ruling had lies in it. They never responded and just ignored it. They continued to post the ruling and leaflets saying that the plaintiff was 'recalcitrant from going to Beis Din' and that members of

the community should not speak to the plaintiff unless absolutely necessary, they should not host the plaintiff in their homes, and they should not do business with the plaintiff.

61. Defendants Willig, Hoberman, and Weissmann were completely aware when and where the Plaintiff went to Beis Din. Defendants Hoberman and Weissmann were copied on each e-mail when the Plaintiff made the arrangements with the Beis Din for each session. Defendant Willig is known to lie about men in these situations in order to be able to excommunicate them thereby depriving them of their freedom of religion and liberties. All this in order to compel Jewish men to give their wives the "Gett" against their free will.

62. Plaintiff had a right to be free from being publicly portrayed in a false or materially misleading manner. Plaintiff is a strictly religious observant person and the lies of the Defendants portray him as someone who violates his religion.

63. Plaintiff did not engage in the conduct that Defendant's publication falsely suggested or implied.

64. Defendant knew that the representation, implication, or impression created by the publication was false, or acted with reckless disregard as to whether the publication placed Plaintiff in a false light.

65. Defendants published or otherwise communicated information concerning Plaintiff to third parties.

66. Defendant nevertheless intentionally or recklessly caused the publication to be disseminated to members of the public.

67. The publication placed Plaintiff before the public in a false light that would be highly offensive to a reasonable person.

68. Defendant's publication was not a mere private communication between individuals. Rather, Defendant intentionally or recklessly caused the material to be made available to members of the public through the Internet.

69. As a direct and proximate result of Defendant's conduct, Plaintiff suffered substantial injury, including but not limited to humiliation, embarrassment, emotional distress, mental anguish, injury to reputation, loss of privacy, and other damages.

70. Plaintiff has suffered and continues to suffer harm as a result of the publication and dissemination of the false and misleading portrayal.

71. Upon information and belief, the publication has been viewed, shared, copied, downloaded, reposted, or otherwise disseminated by additional persons.

72. Defendant's conduct was intentional, willful, malicious, and in reckless disregard of Plaintiff's rights and interests.

73. Plaintiff is entitled to recover all damages and other relief permitted under New Jersey law.

**Count Three: Civil Conspiracy**

Against Keshet Starr, Cory Glicksman, Yonatan Klayman, Jennifer Lankin, The Organization for the Resolution of Agunot (ORA), Mordechai Willig, Scott Hoberman, Shlomo Weissmann, Beth Din of America (BDA)

74. Plaintiff repeats and realleges paragraphs 1 through 73, as if fully set forth herein.

75. All Defendants collaborate with each other to deprive men of their civil liberties. It's a very simple process. The BDA forces a man to come to either their Beis Din or one 'approved' by them. If they don't, they lie about them and excommunicate them. The BDA passes the excommunication document onto ORA who then initiates the public shaming campaign to tell the community not speak to the man, not to let them into the synagogue, and not to do business with them, and not to let them into their home until they give the "Gett"

76. Beginning on or about December of 2022, and continuing through present, Defendants Starr and Glicksman knowingly and intentionally entered into an agreement, understanding, or common plan to deprive Plaintiff of his civil liberty, reputation, religious freedoms, privacy, and other wrongful objectives. In January of 2025, Defendants Klayman and Lankin also became parties to this agreement.

77. Beginning on or about July of 2024, and continuing through present, Defendants Willig, Hoberman, and Weissmann knowingly and intentionally entered into an agreement, understanding, or common plan to deprive Plaintiff of his freedom of religion, civil liberty, reputation, and other wrongful objectives.

78. The Defendant's all knew that the information is false and that it is obtained by corrupt measures. This, however, did not stop them from using the information to harm the Plaintiff.

79. The purpose of the agreement was to force the plaintiff to give his wife a Jewish Divorce document by coercion against his religious beliefs.

80. Defendants shared a common design and acted in concert pursuant to that agreement. Although Plaintiff may not presently know every detail of the agreement or every communication among Defendants, the existence of the agreement may be inferred from Defendants coordinated conduct, communications, and representations.

81. The acts committed by Defendants constituted the underlying actionable wrong of coercion, violation of civil liberties, invasion of privacy and false light as more fully alleged in this Complaint.

82. Each Defendant understood the general objective of the conspiracy and intentionally participated in furtherance of that objective.

83. As a direct and proximate result of Defendants' conspiracy and the wrongful acts committed in furtherance thereof, Plaintiff suffered substantial damages, including but not limited to loss of religion freedom, embarrassment, loss of civil liberties, and other damages.

84. Defendants' conduct was intentional, willful, malicious, and undertaken with knowledge that their actions were likely to cause injury to Plaintiff.

85. Plaintiff is entitled to recover all damages permitted by law resulting from the underlying wrongful conduct and the acts undertaken in furtherance of the conspiracy.

**Count Four: Defamation**

Against Keshet Starr, Cory Glicksman, Yonatan Klayman, Jennifer Lankin, The Organization for the Resolution of Agunot (ORA), Mordechai Willig, Scott Hoberman, Shlomo Weissmann, Beth Din of America (BDA)

86. Plaintiff repeats and realleges paragraphs 1 through 85, as if fully set forth herein.

87. Plaintiff is an Orthodox Jew and has developed a reputation for being strictly observant.

88. Defendants made and/or published the following statement concerning Plaintiff that were false:

A. "Summoned him to arbitration [Din] before numerous Rabbinical Courts".

B. "He has been deemed like he is refusing to appear in Din [before them]".

C. "Writ of recalcitrance has been issued against him".

D. "he's been summoned by other Batei Din [as well] and he has not responded to them properly".

E. "Failed to appear in front of the Beth Din of America or an alternative beth din recognized by the Beth Din of America, for the purpose of giving a Get or submitting to beth din adjudication of Chavi Satz's request for a Get".

89. Defendants made the statement to synagogues, Facebook, www.getora.org, www.instagram.org, local community leaders, etc.

90. The statement expressly identified Plaintiff and was reasonably understood by those who received it to refer to Plaintiff.

91. The statement was false.

92. Specifically, Defendant's statement was false because the Plaintiff agreed each time to appear before Beis Din and did so.

93. Defendant knew the statement was false when Defendant made it, or Defendant acted with reckless disregard for whether the statement was true or false.

94. Alternatively, Defendant acted negligently in making and publishing the false statement despite having no reasonable basis to believe it was true.

95. The statement was presented as a statement of fact rather than merely an expression of opinion.

96. As a result of Defendant's publication of the false statement, third parties believed and reasonably could have believed that Plaintiff violated Jewish law.

97. The statements harmed Plaintiff's reputation and caused him to be prohibited from praying in the Synogauges, caused him to be shunned by the community, to miss out on his daughter's Bat Miztvah, to miss his children's school events, and other deprivation of life's liberties.

98. Plaintiff has suffered actual damages in an amount to be proven at trial.

99. Plaintiff requested that Defendant retract and correct the false statements, but Defendant refused and continued publishing them.

100. The statements were defamatory because they tended to expose Plaintiff to hatred, contempt, ridicule, or loss of reputation and otherwise harmed Plaintiff in Plaintiff's personal, professional, or business community.

101. Defendant acted with actual malice, knowledge of falsity, reckless disregard for truth, and negligence, as applicable under the governing law.

102. The publication of the statements was a substantial factor and direct and proximate cause of injury to Plaintiff.

103. Plaintiff suffered actual and compensable damages as a result of Defendant's defamatory statements.

104. Defendant's conduct was willful, malicious, intentional, and/or reckless, warranting an award of punitive or exemplary damages to the extent permitted by applicable law.

**Count Five: Libel**

Against Keshet Starr, Cory Glicksman, Yonatan Klayman, Jennifer Lankin, The Organization for the Resolution of Agunot (ORA), Mordechai Willig, Scott Hoberman, Shlomo Weissmann, Beth Din of America (BDA)

105. Plaintiff repeats and realleges paragraphs 1 through 104, as if fully set forth herein.

106. Defendant published a statement concerning Plaintiff to one or more third persons.

107. The statement was published through their web site at www.getora.org, Facebook, Instagram, and other social media outlets.

108. The statement specifically stated:

A. "Summoned him to arbitration [Din] before numerous Rabbinical Courts".

B. "He has been deemed like he is refusing to appear in Din [before them]".

C. "Writ of recalcitrance has been issued against him".

D. "he's been summoned by other Batei Din [as well] and he has not responded to them properly".

E. "Failed to appear in front of the Beth Din of America or an alternative beth din recognized by the Beth Din of America, for the purpose of giving a Get or submitting to beth din adjudication of Chavi Satz's request for a Get".

109. The statement referred to the Plaintiff by name showing that this referred specifically to the Plaintiff.

110. The statement was false.

111. Specifically, the statements are false because the Plaintiff was only summoned to one Beis Din, responded each time he as summoned, there was never a writ of recalcitrance against him, and he never refused to appear before any Beis Din.

112. Defendant knew that the statement was false, or acted with reckless disregard for whether the statement was true or false.

113. Defendant published the statement to third parties, including the entire Jewish Community.

114. The statement was understood by those who received it to accuse Plaintiff of violating Jewish Law.

115. The statement harmed Plaintiff's reputation and caused Plaintiff to be viewed negatively by others.

116. As a direct and proximate result of Defendant's publication, Plaintiff suffered damages, including loss of Liberty, loss of religious freedom, emotional distress, loss of reputation, and other significant damage to be presented at trial.

117. Plaintiff has also suffered and continues to suffer harm to his reputation and standing in the community.

118. Plaintiff requested that Defendant retract, remove, and correct the defamatory statement on numerous occasions, but Defendants refused to.

119. Defendant's conduct was intentional, knowing, malicious, and in reckless disregard of Plaintiff's rights.

120. The statement was defamatory because it tended to harm Plaintiff's reputation and expose Plaintiff to ridicule, harassment, disgrace, loss of community standing, and other harm to be presented at trial.

121. Defendant's publication of the statement was a substantial factor in causing Plaintiff's injuries and damages.

122. Plaintiff has suffered actual damages in an amount to be determined at trial.

123. To the extent permitted by law, Plaintiff seeks all additional damages available based upon Defendant's knowing, intentional, malicious, and reckless conduct.

**Count Six: Tortious Interference with an Existing Contract**

Against Keshet Starr, Cory Glicksman, Yonatan Klayman, Jennifer Lankin, The Organization for the Resolution of Agunot (ORA), Mordechai Willig, Scott Hoberman, Shlomo Weissmann, Beth Din of America (BDA)

124. Plaintiff repeats and realleges paragraphs 1 through 123, as if fully set forth herein.

125. Under the Matrimonial Settlement Agreement (MSA), and the Beis Din Agreement within, that Mrs. Satz and the Plaintiff signed upon finalizing their divorce in October of 2020, Plaintiff was entitled to be free of harassment from third parties as if he was single, to choose the Beis Din that will decide the matter of the "Gett", to not have anything interfere with his relationship with his children, and other matters to be presented at trial.

126. The Contract was valid and enforceable and remained in effect during the events described herein.

127. Plaintiff fully performed, or substantially performed, its obligations under the Contract, including agreeing to submit to Beis Din regarding the matter of the "Gett" and fulfilled his other obligations under the MSA.

128. At all relevant times, Defendants knew of the existence of the Contract and knew that Plaintiff and Mrs. Satz had an existing contractual relationship.

129. Defendants obtained knowledge of the Contract through, among other things, communication from the Plaintiff.

130. Despite knowing of the Contract, Defendants intentionally undertook actions designed to interfere with Plaintiff's contractual relationship with Mrs. Satz.

131. Defendant's interference was without justification or excuse.

132. Specifically, Defendants harassed Plaintiff, interfered with the relationship with his children since he was not allowed to attend synagogue or go to school events, belittled the Plaintiff in the children's eyes, summoned him to a new Beis Din not in the MSA agreement, and other things that will be presented at trial.

133. Defendant's conduct was intentional. Defendants either specifically intended to interfere with Plaintiff's contractual relationship or knew that its actions were substantially certain to cause such interference.

134. Defendant's conduct was without justification or legitimate excuse and was undertaken for the purpose of forcing Plaintiff to give a "Gett" without submitting a complaint for damages to a Beis Din as the Beis Din ruling stated.

135. Defendants was not a party to the Contract between Plaintiff and Mrs. Satz.

136. As a direct and proximate result of Defendant's conduct, Mrs. Satz breached the contract by refusing to submit to Beis Din for damages, allowed the Plaintiff to be harassed by a third party, allowed the relationship between the children and the Plaintiff to suffer, and other damages to be presented at trial.

137. The interference caused Plaintiff to lose the benefits to which Plaintiff was entitled under the Contract.

138. Specifically, Plaintiff lost the right to attend synagogue, the right to be free of harassment, the right to parent his children without interference, and other rights to be presented at trial.

139. Plaintiff would have received those contractual benefits but for Defendant's intentional and unjustified interference.

140. Plaintiff reserves the right to amend this Complaint to assert additional damages and claims revealed through discovery.

141. Defendant's conduct was malicious within the meaning of New Jersey law, in that Defendants intentionally committed wrongful acts without justification or excuse.

142. As a direct and proximate result of Defendant's tortious interference, Plaintiff suffered actual and ascertainable damages.

143. Plaintiff is therefore entitled to recover compensatory damages in an amount to be proven at trial, together with all other damages and relief permitted by law.

144. To the extent permitted by law, Plaintiff further seeks punitive damages because Defendant's conduct was willful, wanton, and malicious.

145. Plaintiff also seeks reasonable costs of suit and, where authorized by law, counsel fees and any other appropriate relief.

**Count Seven: Intentional Affliction of Emotional Distress**

New Jersey Rule 3.30F

Against Keshet Starr, Cory Glicksman, Yonatan Klayman, Jennifer Lankin, The Organization for the Resolution of Agunot (ORA). Mordechai Willig, Scott Hoberman, Shlomo Weissmann, Beth Din of America (BDA)

146. Plaintiff repeats and realleges paragraphs 1 through 145, as if fully set forth herein.

147. Defendant engaged in intentional and reckless conduct directed toward Plaintiff.

148. Defendant's conduct included, but was not limited to, the following:

A. Lied about the Plaintiff's actions to the public.

B. Told the public to stay away from Plaintiff and not let him participate in prayers at synagogue.

C. Intimidated Plaintiff to violate his religious freedoms.

D. Interfered with the agreement that Plaintiff had with his ex-wife in the MSA

E. Other actions that will be presented at trial.

149. Defendant knew that Plaintiff was particularly susceptible to emotional distress because Plaintiff told them numerous times of his children suffering due to their actions.

150. Despite knowing this, Defendants continued and intensified the conduct.

151. Defendant's conduct was deliberate and intentional and was undertaken with reckless disregard for the highly probable consequences to Plaintiff.

152. Defendant's conduct was not an isolated or accidental occurrence but was part of a continuing course of conduct.

153. Defendant's conduct was extreme and outrageous and went beyond all bounds of decency tolerated in a civilized community.

154. Among other things, Defendants protested the Plaintiff's parents who are in their seventies, harassed his siblings with phone calls, has strangers call his parents with threats, deprived Plaintiff of religious rituals before holidays, and other actions that will be named at trial.

155. Defendant intended to cause Plaintiff severe emotional distress and acted with knowledge that severe emotional distress was substantially certain or highly probable to result from Defendant's conduct.

156. Defendant's conduct was a substantial factor and direct and proximate cause of Plaintiff's emotional injuries.

157. As a direct and proximate result of Defendant's conduct, Plaintiff suffered severe emotional distress, including migraine headaches, loss of sleep, inability to concentrate, loss of social interaction, loss of enjoyment of life, fear, anxiety, humiliation, and other ailments to be named at trial.

158. Plaintiff's emotional distress substantially interfered with Plaintiff's daily life, employment, relationships, and ability to function.

159. Plaintiff sought and required medical treatment and counseling, resulting in expenses and additional damages.

160. Plaintiff has incurred and will incur medical, counseling, and other treatment expenses as a result of Defendant's conduct.

161. Plaintiff has suffered additional damages, including lost income, diminished earning capacity, loss of enjoyment of life, and other economic and noneconomic damages, to the extent applicable.

162. The full nature and extent of Plaintiff's injuries and damages continue to develop and will be established through discovery and at trial.

163. Plaintiff's emotional distress was genuine, substantial, and severe.

164. Plaintiff has suffered and continues to suffer emotional, psychological, physical, economic, and other damages as a direct and proximate result of Defendant's conduct.

165. As a direct and proximate result of Defendant's conduct, Plaintiff is entitled to compensatory damages in an amount to be determined at trial.

166. Defendant's conduct was willful, malicious, intentional, and in wanton and reckless disregard of Plaintiff's rights, thereby warranting punitive damages to the extent permitted by New Jersey law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Allen Satz prays for judgement as follows:

A. To order Avraham Kahan, Dovid Bartfeld, and Yisroel Isaacs to turn over the transcript and recording from the mediation session that resulted in the July 6, 2022 ruling.

B. Compensatory damages in an amount to be determined at trial;

C. Awarding damages for Plaintiff's severe emotional distress, mental anguish, humiliation, pain and suffering, and loss of enjoyment of life;

D. Damages for injury to Plaintiff's reputation and privacy interests;

E. The Defendant shall remove all posts, pictures, statements, and any other related material regarding the Plaintiff from all websites, social media accounts, on-line newspaper and any other venue they may be aware of.

F. Write a public letter rescinding their positions against the Plaintiff. The letter should state that the Plaintiff should be allowed into all the synagogues, the community shall all welcome the Plaintiff into their home, etc.

G. The letter should state that the Defendants purposely lied about the Plaintiff to force him to do their bidding against his free will.

H. Also, any restriction that were put in place to limit the Plaintiff's freedom of religion should be lifted.

I. This letter should be distributed in the same manner as the false content was spread. This includes, but not limited to, Facebook, Instagram, newspaper ad, mass e-mail, etc.

J. Awarding Plaintiff consequential and other damages proximately caused by Defendant's conduct;

K. Awarding medical, counseling, and other treatment expenses incurred and reasonably expected to be incurred;

L. Punitive and exemplary damages to the extent permitted by law;

M. Costs of suit and other recoverable litigation expenses;

N. Attorney's fees to the extent authorized by applicable law;

O. Such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff requests trial by jury as to all issues in this case.

Dated: September 11, 2026

Signed ____________

Plaintiff Allen Jeffrey Satz

Allen Jeffrey Satz
113 Cameron Road
Bergenfield NJ 07621
845-521-6668
Email address: ajs@zoneshopstore.com
Pro Se Plaintiff

**CERTIFICATION**

I hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

DATED: 9/11/26

ALLEN SATZ